# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| WILLIS, | CASE NO: 1:10-cv-1094 |
| Plaintiff, | |
| v. | MAGISTRATE JUDGE NANCY A. VECCHIARELLI |
| INTEGRITY REALTY GROUP, LLC *et al.*, | |
| Defendants. | **MEMORANDUM OPINION AND ORDER** |

This case is before the undersigned United States Magistrate Judge upon the consent of the parties. (Doc. No. 9.) Before the Court is Defendants Integrity Realty Group, LLC's ("Integrity") and Mildred Allen's ("Allen") (collectively "Defendants") Motion for Summary Judgment. (Doc. No. 18.) Plaintiff, Tomeka Willis ("Willis"), opposes. (Doc. No. 22.) For the reasons set forth below, Defendants' motion for summary judgment is DENIED.

## I. BACKGROUND

### A. Factual Background

Willis alleges that "Defendant terminated Willis because she refused to study the

precepts of the Jehovah's Witnesses or otherwise accept the Jehovah's Witness faith." (Compl. ¶ 9.) The following material facts are not disputed by the parties unless otherwise indicated.

On July 1, 2007, Willis began residing in an apartment at Shaker North Apartments ("Shaker North") with her husband.[1] At that time, Willis considered herself a Baptist. Allen was a rental agent at Shaker North and an associated apartment complex, Shaker West Apartments ("Shaker West") (collectively "the Shaker apartments"). Allen was a Jehovah's Witness. Willis met Allen when she moved into Shaker North.

Allen allegedly had been in charge of hiring employees at the Shaker apartments for 13 years, at least before Integrity took over management of the Shaker apartments. Most of the employees at the Shaker apartments were Jehovah's Witnesses, and Allen had hired them because they were people she knew.

In November 2008, Willis's husband was hired as a maintenance man at the Shaker apartments.[2] Between that time and January 2009, Willis and her husband expressed to Allen an interest in learning more about the Jehovah's Witness faith.[3] On January 1, 2009, Willis invited Allen to her apartment to conduct a Bible study. Willis and her husband continued to conduct Bible studies with Allen in this manner on a weekly basis.

---

[1] At that time, Willis and her husband were engaged to be married.

[2] It is not clear who was responsible for hiring Willis's husband.

[3] It is not clear whether Willis's husband was hired before or after expressing an interest in the Jehovah's Witness faith.

Integrity began managing the Shaker apartments on February 1, 2009. Dan Siegel ("Siegel") was the property manager and hired Allen to continue to perform on-site management. Siegel was Jewish. When Integrity took over management of the properties, it changed certain policies, raised the cost of rent, and required tenants to pay for their electricity when the tenants previously were not required to do so. This upset some tenants and caused them to decline to renew their leases.

Around the time that Integrity took over management, Allen told Willis that there was a job opening as an assistant rental agent for the Shaker apartments. The job duties included assisting Allen by answering the telephone, receiving rental applications, and showing prospective renters apartments in both Shaker North and West. Allen also was responsible for showing apartments to prospective tenants, but remained solely responsible for processing rental applications and deciding whether to rent to particular applicants. Allen recommended Willis for the position to Siegel instead of recommending her cousin, Reba Tolbert, who also lived at the Shaker apartments and sought the position, and who was not a Jehovah's Witness but had studied the faith and visited a Jehovah's Witness hall in the past. Siegel briefly interviewed and hired Willis. Willis had been employed at a bank, but left that job and, on March 3, 2009, began working for Integrity as an assistant rental agent. Willis was the first person to work as an assistant under Allen.

Willis continued to study the Jehovah's Witness faith with Allen through the spring of 2009 and attended a Jehovah's Witness Hall on three occasions beginning in April 2009. On May 14, 2009, however, Willis told Allen that she would not continue the Bible studies because she did not agree with the teachings of the Jehovah's Witness

-3-

faith.[4] Before Willis discontinued her studies, Allen was friendly and interested in Willis's personal life; after Willis discontinued her studies, Allen became distant with Willis and disinterested in Willis's personal life. Subsequent communications between Allen and Willis consisted of either Allen's encouragement for Willis to return to her study of the Jehovah's Witness faith, or strict business matters. Furthermore, Allen stopped recognizing Willis's hard work and stopped offering Willis help, such as driving Willis from Shaker North to Shaker West, which were separated by train tracks.

Between March and July 2009, the occupancy rate in Shaker North dropped 8%, from 83% in March to 75% in July. The occupancy rate in Shaker West dropped 5%, from 90% in March to 85% in July. Throughout that time, the Shaker apartments underwent major renovations, including replacement of the roofs, renovation of twenty apartment units, and work on the elevators, common areas, and parking garage. The parties dispute, however, whether most of the renovations occurred at only Shaker North at that time, or at both properties.

Siegel routinely monitored the occupancy rates at the Shaker apartments and was dissatisfied with them; he was concerned that, if the number of vacancies continued to increase, he would not be able to meet his financial obligations on the properties. Siegel spoke with Allen about that dissatisfaction. Allen subsequently contacted another Integrity employee, Helen Eidenmiller, to "shop" Willis—that is, to call Willis, pretend to be a prospective renter, inquire about the availability of units at the

---

[4] Willis's husband continued the Bible studies with Allen.

-4-

Shaker apartments, and secretly evaluate Willis's job performance.[5]  Eidenmiller "shopped" Willis on Friday, July 17, 2009.  Siegel did not know that Allen contacted Eidenmiller to "shop" Willis, or the alleged results of the "shop," until Allen reported the results to him.

Defendants' account of Eidenmiller's "shop" is based on Eidenmiller's recollection during deposition.  Eidenmiller asked Willis whether there were any apartments available in the Shaker apartments, and Willis allegedly told her that there were no apartments available in Shaker West and that Eidenmiller would have to contact Allen for information about Shaker North.  However, there were 33 vacancies at Shaker West at that time.  Eidenmiller also asked Willis whether she could visit some apartments on the next day, Saturday, and Willis allegedly told Eidenmiller that no apartments could be shown on Saturday.

Willis denies Eidenmiller's account of the "shop."  Rather, Willis avers in her affidavit that, at some time on the same Friday that Eidenmiller "shopped" Willis, she answered a telephone call from an unspecified, inquiring prospective tenant and told the caller there *were* vacancies at Shaker West.  Furthermore, Willis avers that she did not refer the caller to Allen for information about Shaker North, and that the caller never told her when she wished to look at apartments.

When Siegel learned of the allegedly unfavorable results of Eidenmiller's "shop," he concluded that the drop in the occupancy rates at the Shaker apartments was

---

[5] Eidenmiller worked for Integrity as an accounting manager and had "shopped" other Integrity employees in the past, although she had never "shopped" an employee at the Shaker apartments before this time.

caused by Willis's ineffectiveness as an assistant rental agent.  On Monday, July 20, 2009, Siegel visited the Shaker apartments to meet with Willis and Allen and informed Willis that she was being terminated from her position as assistant rental agent.  The meeting lasted only a few minutes and Siegel did not tell Willis why she was being terminated, and Willis never asked why.  After Willis was terminated, the occupancy rates at the Shaker apartments began to improve.

Before being terminated, Willis had never been formally reprimanded for poor job performance.  Allen had informally disciplined Willis only twice:  once for not showing up to work on time on a Saturday, and once for wearing a baseball cap to hide her unkempt hair.

During Willis's tenure with Integrity, Siegel never knew that Willis had engaged in Bible studies with Allen to learn about the Jehovah's Witness faith, or that Willis discontinued and declined to return to such studies.  After Willis was terminated, Allen told Willis that she had been terminated because of the "shop" results.  Allen never told Willis that her termination had anything to do with Willis's choice to discontinue studying the Jehovah's Witness faith or for any other reason based on religion.

Willis was shortly thereafter replaced by Allen's sister, Maria Tabb ("Tabb"). Tabb was not a Jehovah's Witness and was not otherwise studying the Jehovah's Witness faith.  Tabb had, however, visited a Jehovah's Witness Hall in the past.

### B. Procedural Background

On May 14, 2011, Willis filed her complaint and alleged two Counts of discrimination based on religion pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and Ohio Revised Code Section 4112.02.  (Doc. No. 1.)  On

-6-

June 25, 2010, Defendants answered. (Doc. No. 5.) On May 11, 2011, Defendants filed their motion for summary judgment. (Doc. No. 18.) On June 21, 2011, Willis responded in opposition. (Doc. No. 22.) On July 19, 2011, Defendants filed their reply to Willis's response. (Doc. No. 24.)

## II. LAW & ANALYSIS

### A. Summary Judgment Standard of Review

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party can meet this burden in two ways: by presenting sufficient evidence to indicate there is no genuine issue of material fact; or by arguing that the nonmoving party, after adequate time for discovery, fails to show sufficient evidence to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. See *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

In reviewing summary judgment motions, a court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of

material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Pachla v. Saunders Sys., Inc.*, 899 F.2d 496, 498 (6th Cir. 1990).  In addition, the Court does not weigh the evidence or make credibility determinations.  *Joostberns v. U. Parcel Servs., Inc.*, 166 F. App'x 783, 787 (6th Cir. 2006).  The determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to defeat a motion for summary judgment; there must be evidence on which the jury could reasonably find for the nonmoving party.  *Id.*  Ultimately, the court should determine whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law.  *Anderson*, 477 U.S. at 251-52.

### B. Willis's Religious Discrimination Claims

Title VII of the Civil Rights Act of 1964 prohibits employers from discharging employees because of the employees' religion.  42 U.S.C. § 2000e-2(a)(1); *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 623 (6th Cir. 2000).  This prohibition includes terminations of employees because the employees' conduct or religious beliefs are inconsistent with those of their employers.  *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 727 (6th Cir. 2009) (citing *Hall*, 215 F.3d at 624).  Federal case law interpreting Title VII is generally applicable to cases involving alleged violations of Ohio Revised Code Chapter 4112.  *Jackson v. Int'l Fiber Corp.*, 395 F. App'x 275, 280 (6th Cir. 2010) (quoting *Plumbers & Steamfitters Joint Apprenticeship*

*Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 421 N.E.2d 128, 131 (Ohio 1981)).  Accordingly, the Court's analysis of Willis's discrimination claim under Ohio law shall be incorporated into its analysis of Willis's discrimination claim under Title VII.

Willis bases her claim for religious discrimination on the "cat's paw" theory.  In the employment discrimination context, "cat's paw" refers to a situation in which an adverse hiring decision is made by a supervisor who is not impermissibly biased, but who was influenced by another individual who *was* motivated by such bias.  *See Roberts v. Principi*, 283 F. App'x 325, 333 (6th Cir. 2008); *Arendale v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008); *cf.* Staub v. Proctor Hosp., ___ U.S. ___, 131 S. Ct. 1186, 1194 (2011) ("We therefore hold that if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA.").  Therefore, the issue here is not whether *Siegel* was biased against Willis for Willis's rejection of the Jehovah's Witness faith, but whether *Allen* was biased against Willis for Willis's rejection of the Jehovah's Witness faith, intended to have Willis terminated because of her rejection of the Jehovah's Witness faith, and influenced an unwitting Siegel to that end.

To survive a motion for summary judgment based on a claim of discrimination under Title VII, a plaintiff must present either direct evidence of discrimination or circumstantial evidence from which a jury could infer discrimination.  *Ploscowe v. Kadant*, 121 F. App'x 67, 71 (6th Cir. 2005).  Willis has not provided any direct evidence

of discrimination.[6]

Absent direct evidence of discrimination, a plaintiff's claim is properly analyzed using the burden-shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2010).[7]  Under this framework, the plaintiff has the initial burden to demonstrate a *prima facie* case of discrimination.  *Id.* (citing *Burdine*, 450 U.S. at 253).  If the plaintiff successfully demonstrates a *prima facie* case of discrimination, the burden of production shifts to the

---

[6] Willis cites *Blalock v. Metals Trades, Inc.*, 775 F.2d 703 (6th Cir. 1985) in a footnote to support her contention that she has shown direct evidence of discrimination.  (Pl.' Opp'n 12 n.4.)  *Blalock*, however, is distinguishable.  In *Blalock*, the court recognized that the plaintiff had argued a mixed-motive case and presented direct evidence of religious discrimination; the issue on appeal was whether the plaintiff failed to prove that his employer terminated him with discriminatory intent.  *Id.* at 706.  The direct evidence included a letter from the plaintiff's supervisor to the Ohio Civil Rights Commission wherein the supervisor explained that the plaintiff "was hired with the full knowledge and understanding that Metals Trades is a Christian Company and our rule book is the word of God, or the Bible."  *Id.* at 405.  The supervisor continued that, although he generally liked the plaintiff and terminated him for "strictly secular reasons," the plaintiff's "problem is that he refuses to submit himself to those in authority over him and the Bible makes it clear that we are to be in submission."  *Id.* at 705-06.  The supervisor concluded by quoting biblical passages.  *Id.* at 706.  Plaintiff has provided no such evidence here.  Moreover, the analytical frameworks used for direct and circumstantial evidence are mutually exclusive, *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348 (6th Cir. 2009), and Willis has presented her arguments in her brief in opposition within the framework for circumstantial evidence notwithstanding her claim that she has presented direct evidence of discrimination.

[7] The *McDonnell Douglas*/*Burdine* burden-shifting framework does not apply to the summary judgment analysis of Title VII mixed-motive claims.  *White*, 533 F.3d at 400.  This is not a mixed-motive case, however, as Willis has not given any notice that she is pursuing a mixed-motive claim.  *See Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010).

defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action.  *Id.*  If the defendant is able to accomplish this, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but was merely a pretext for discrimination.  *Id.* at 391-92 (citing *Burdine*, 450 U.S. at 253).  Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  *Id.* at 392 (citing *Burdine*, 450 U.S. at 253).

Defendants argue that, to establish a *prima facie* case of disparate treatment, Willis must show:  (1) she was subjected to some adverse employment action; (2) at the time the adverse employment action was taken, her job performance was satisfactory; and (3) some additional evidence to support the inference that the adverse employment action was taken because of a discriminatory motive based on her failure to hold or follow her employer's religious beliefs. (Def.'s Mot. Summ. J. at 8 *and* Reply at 1-2, *citing Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1038 (10th Cir.1993) *and Nichols v. Snow*, No. 3:03-cv-341, 2006 WL 167708, at *12 (M.D. Tenn. Jan. 23, 2006) (adopting the *Shapolia* court's analysis).[8]

---

[8] This *prima facie* standard is based on that used for "reverse discrimination" claims because, under circumstances in which the plaintiff is allegedly discriminated against for *not* being a member of a particular class, and "the defendant is one of those unusual employers who discriminates against the majority," the *McDonnell Douglas prima facie* standard requires modification. *Shapolia*, 992 F.2d at 1038.  Indeed, the standard *McDonnell Douglas prima facie* framework may be modified to accommodate different employment discrimination contexts. *Murray v. Thisledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (citing *McDonnell Douglas*, 411 U.S. at 802 n.13).  The Sixth Circuit, however, has not had the occasion to decide whether the *Shapolia*

-11-

Defendants concede that Willis suffered an adverse employment action, as Willis was terminated. Defendants contend, however, that Willis cannot show that her job performance was satisfactory at the time she was terminated or, assuming she could satisfy the second prong of the test, she cannot show some *additional* evidence to support an inference that she was terminated because of a discriminatory motive based on her failure to hold or follow her employer's religious beliefs.

Instead of challenging Defendants' argument that Willis cannot establish a *prima facie* case of disparate treatment, Willis responds that she is able to show: (1) she engaged in an activity protected by Title VII; (2) Allen knew she was engaged in a protected activity; (3) Allen took an employment action, through Siegel, that was adverse to Willis; and (4) there was a causal connection between Willis's protected activity and the adverse employment action. (Pl.'s Opp'n 12, *citing Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004)). This *prima facie* standard is for a claim of retaliation. *Smith*, 378 F.3d at 570.

Defendants reply that Willis argues the wrong *prima facie* standard because Willis has not claimed that she suffered retaliation. The Court need not determine which *prima facie* standard is most appropriate here, however, because although Defendants proffered a legitimate, non-discriminatory reason for terminating Willis, Willis has shown there is a genuine issue of whether Defendants' reason is pretextual and whether Willis suffered intentional discrimination.

court's analysis is appropriate. See *Pedreira*, 579 F.3d at 728 (declining to resolve the issue because it was premature, as the question before the court was whether the plaintiff's discrimination claims had been properly dismissed).

-12-

Although a defendant is not required to convince the court that its proffered reasons for terminating an employee actually motivated its actions, it must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's termination. *Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 169 (6th Cir. 1996) (quoting *Burdine*, 450 U.S. at 254-55).  Defendants offer a non-discriminatory reason for terminating Willis:  Siegel concluded, upon receiving Eidenmiller's alleged "shop" results, that Willis was responsible for the declining occupancy rates at the Shaker apartments.  Willis does not challenge that this reason, if true, constitutes a legitimate non-discriminatory reason for her termination, but only contends that this reason is pretextual.

Pretext may be established either directly by persuading the trier of fact that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence.  *White*, 533 F.3d at 392. A plaintiff will usually demonstrate pretext by showing that the employer's stated reason either:  (1) has no basis in fact; (2) was not the actual reason; or (3) is insufficient to explain the employer's action.  *Id.* at 293.  Willis contends that Defendants' reason is pretext because:

- There were other causes for the decreasing occupancy rates, including the failing economy, the increasing cost of renting at the Shaker apartments, and the renovations at the Shaker apartments;

- Willis recalls that her conversation with an unspecified person over the telephone on the same day that Eidenmiller "shopped" Willis was satisfactory; and

-13-

- Siegel's testimony of why he terminated Willis is unworthy of credence because, at his deposition, Siegel expressed disgust with the fact that Willis was suing Integrity and disparaged Willis's counsel.

The Court finds that Willis has produced sufficient evidence to show that a genuine issue of fact exists with respect to whether Defendants' stated reason for terminating Willis was pretextual. Again, the question here is whether Siegel terminated Willis because *Allen* was religiously biased against Willis, Allen *intended* to have Willis terminated pursuant to that bias, and Allen *caused* Siegel to terminate Willis. It is undisputed that: (1) Allen hired many Jehovah's Witnesses to work at the Shaker apartments before Integrity took over management; (2) Allen was Willis's supervisor and reported to Siegel; (3) Allen recommended that Siegel hire Willis *after* Willis showed an interest in the Jehovah's Witness faith; (4) Allen became less friendly with, and less supportive of Willis after Willis discontinued her Bible studies and declined to return; (5) Allen continued to encourage Willis to return to her study of the Jehovah's Witness faith, and Willis continued to decline; (6) Allen had Willis "shopped"; (7) Siegel terminated Willis only after Allen reported the allegedly adverse "shop" results to Siegel; (8) there were other possible reasons for the declining occupancy rates; (9) before Willis was "shopped," Willis had never been reprimanded for poor job performance as it related to occupancy rates; and (10) Tabb replaced Willis, and although Tabb was not practicing or studying the Jehovah's Witness faith, Tabb was Allen's sister and had associated with the Jehovah's Witnesses in the past.

Although Defendants contend that Plaintiff was terminated not just because of the declining occupancy rates, but also because of Eidenmiller's allegedly adverse "shop" results, the "shop" was a single, isolated event and Defendants rely only upon

-14-

Eidenmiller's recollection of the event; Defendants have not provided an audio recording or formal report of Eidenmiller's telephone call.  Moreover, Willis denies telling a caller on the Friday Eidenmiller "shopped" Willis that there were no vacancies in Shaker West, that the caller should contact Allen for information about Shaker North, and that no apartments could be shown on Saturday.  Defendants counter that Willis's recollection in her affidavit of a telephone conversation with an unspecified person[9] on the Friday she was "shopped" is not specific enough to conclude that Willis is averring to her conversation *with Eidenmiller* and, therefore, does not create a genuine issue as to the how Plaintiff really performed on Eidenmiller's "shop."  The Court disagrees.  Willis has averred to a telephone conversation with a woman[10] on the same day as Eidenmiller's "shop" that addressed the same issues as Eidenmiller's "shop."  As the Court must view the facts in the light most favorable to Willis, the Court concludes that the results of the "shop" are in dispute and are material.  This issue raises a question of credibility that must be decided by the fact finder.  Accordingly, Willis has presented sufficient evidence to challenge Defendants' account of the "shop" and, therefore, the reasons for her termination.

In short, Willis has presented enough circumstantial evidence, viewed in a light most favorable to Willis, to permit the inference that Allen intended to have Willis terminated because Willis rejected the Jehovah's Witness faith, and that Allen manipulated Siegel to that end.  See *Nichols*, 2006 WL 167708, at *14 (finding

---

[9] Defendants do not explain any basis for their suggestion that Willis should have been able to identify Eidenmiller as the caller.

[10] Willis uses the pronouns "she" and "her" to describe the caller.

sufficient evidence to show a genuine issue of pretext when the plaintiff presented evidence of his supervisor's religious animus, that the supervisor had influence over the information presented to the decision maker that led to the plaintiff's termination, and that the decision maker relied on that information). Accordingly, summary judgment is not appropriate.

### III.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is DENIED.

s/ *Nancy A. Vecchiarelli*
U.S. MAGISTRATE JUDGE

Date:  August 9, 2011